*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

DAVID P. ONSTED,

       Plaintiff-Appellee,

v

AUTO OWNERS INSURANCE COMPANY
AND HOME OWNERS INSURANCE
COMPANY,

       Defendants,

and

ROBERT LAPENNA,

       Defendant-Appellant.

UNPUBLISHED
February 27, 2020

No. 346355
Calhoun Circuit Court
LC No. 2016-003267-NI

Before: FORT HOOD, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

After a jury rendered a verdict in favor of plaintiff, David Onsted, in this third-party no-fault action, the trial court entered a judgment that included the jury's noneconomic damage award. Defendant, Robert LaPenna, appeals as of right, taking issue with the trial court's pre-trial order denying his motion for summary disposition. Because genuine issues of material fact existed for

the jury to resolve with respect to whether plaintiff's injuries affected his general ability to lead his normal life, we affirm.[1]

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In October 2015, plaintiff was riding his motorcycle to work when he was struck by defendant, who was driving a Ford Explorer. Having just exited the expressway, plaintiff was accelerating to reach the speed limit, traveling somewhere between 40 miles per hour to 55 miles per hour, when defendant pulled out of a private drive and began to cross in front of plaintiff.[2] Plaintiff testified that he saw the accident as it was unfolding and tried to avoid being hit. Unable, he undertook to "ride it out," or drive through the collision, as letting the motorcycle lay down would cause him more injuries. The SUV's front bumper caught the right side of the motorcycle in the saddlebag, causing the rear tire to lose traction and skid sideways. Plaintiff's motorcycle "curv[ed]" around defendant's bumper, but plaintiff was able to avoid having the motorcycle go down or the SUV to come into contact with any part of his body, although he felt a jar in his body and his neck was cocked in the incident as he leaned the motorcycle, a heavy Harley-Davidson, to the right in order to counteract the impact that forced his motorcycle to the left.

After police were summoned and the parties assisted in the completion of a traffic crash report, plaintiff proceeded to the Battle Creek VA Medical Center, where he worked as a maintenance worker in the Community Living Center. Plaintiff testified that he did not initially think he was injured, but later that day, he began to experience stiffening of the muscles in his back and neck. Plaintiff saw a chiropractor for the back and neck pain starting in November 2015. After seven or eight months of chiropractic care, his back pain caused by the accident resolved. But his neck pain persisted, and in the spring of 2016, the pain began to radiate into his right shoulder, and sometimes it would go down his right arm. In July or August of 2016, he sought medical treatment with his primary physician, who referred him to a neurologist. The neurologist sent plaintiff to a pain clinic, where they administered epidural steroid injections in the base of his neck. The injections did not work. Plaintiff was sent to physical therapy from August 2016 to November 2016, but that did not relieve his neck pain. He was ultimately diagnosed with two bulging disks in his neck in 2016, and in 2017, he was prescribed a TENS (transcutaneous electrical nerve stimulation) machine. On May 13th, 2017, plaintiff was riding his motorcycle when a car crossed the centerline and struck him, causing him to lose his left leg at the knee, among other injuries. Plaintiff testified that his neck pain finally got better after seven weeks in the hospital following the second accident. At the time of his deposition in September 2017, plaintiff's shoulder pain had resolved, and his neck pain had diminished to an intermittent 2 out of 10.

---

[1] Plaintiff also brought suit against Auto Owners Insurance Company (Auto Owners) and Home Owners Insurance Company (Home Owners). They are not parties to this appeal.

[2] Because defendant takes issue with the trial court's denial of his motion for summary disposition, the facts in this opinion are gleaned from the parties' deposition testimony and evidence produced in relation to defendant's motion for summary disposition.

Plaintiff filed the present lawsuit against defendant, contending that he was entitled to noneconomic losses because he had suffered a threshold injury under the no-fault insurance act, MCL 500.3101 *et seq*.[3] Defendant moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff did not have a threshold injury because he did not have an objectively manifested impairment that affected his ability to lead a normal life. The trial court denied defendant's motion, and the case proceeded to trial. A jury ruled in favor of plaintiff and awarded him damages.

## II. STANDARD OF REVIEW

This Court reviews de novo a grant of summary disposition under MCR 2.116(C)(10). *Henderson v State Farm Fire and Cas Co*, 460 Mich 348, 353; 596 NW2d 190 (1999). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). When determining whether to grant a motion for summary disposition, "a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Quinto v Cross and Peters Co*, 451 Mich 358, 362; 547NW2d 314 (1996). The court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 480; 776 NW2d 398 (2009).

We review issues of statutory interpretation de novo. See *McQueer v Perfect Fence Co*, 502 Mich 276, 285-286; 917 NW2d 584 (2018).

## III. ANALYSIS

The no-fault act limits tort liability "for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle" to "a list of enumerated circumstances." *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010); see also MCL 500.3135(3), as amended by 2012 PA 158.[4] MCL 500.3135(1) states that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement."

For an injury to meet the definition of a serious impairment of body function, it must be (1) an objectively manifested impairment (2) of a body function that is significant or important to the specific injured person, and (3) it must affect the person's general ability to lead his or her normal life. MCL 500.3135(5); *Chouman v Home Owners Ins Co*, 293 Mich App 434, 441; 810 NW2d 88 (2011); *McCormick*, 487 Mich at 215. An impairment affects a person's general ability

---

[3] Plaintiff also sought wage loss and allowable expenses from Auto Owners (defendant's auto insurance provider) and sought underinsured motorist benefits from Home Owners (plaintiff's motorcycle insurance provider). As noted, those claims are not at issue on appeal.

[4] MCL 500.3135 was amended in June 2019 to incorporate the language of *McCormick* into the statute. See MCL 500.3135, as amended 2019 PA 21.

to lead his or her normal life if it has had "an influence on some of the person's capacity to live in his or her normal manner of living." *McCormick*, 487 Mich at 202. In determining if a person's general ability to lead his or her normal life has been affected, a trial court must perform "a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis," comparing "the plaintiff's life before and after the incident." *Id*. "There is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected," and there is no "temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *Id*. at 203. Finally, "the statute merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed" by the impairment. *Id*. at 202.

Defendant argues that the trial court erred by determining that a genuine issue of material fact existed as to whether plaintiff had sustained a serious impairment of body function, because plaintiff did not demonstrate that his general ability to lead his life was affected.[5] We disagree.

The record shows conflicting evidence regarding whether plaintiff's impairment negatively affected his work, leisure, and family activities. Plaintiff testified that he was not placed on any restrictions at work, he was able to perform household chores, and there were no activities that he was restricted from after his 2015 accident. However, he also testified that the accident left him with back, neck, and later shoulder pain, and he had to fight through the pain and take sick leave from work in order to attend "various appointments, doctors, chiropractors, occasional physical therapy . . . ." See *McCormick*, 487 Mich at 218 (noting that the plaintiff was attending physical therapy months after sustaining an impairment which affected his ability to lead a normal life). He testified that he struggled to look up at work while doing tasks such as painting or working on ceiling tiles, and that doing so would aggravate his neck pain.

Plaintiff also testified that in 2016, he attended the Michigan Bikers Helping Veterans fundraiser ride and was unable to complete the event. He stopped riding on the third day because of his neck pain even though he was supposed to ride for five days. Although defendant argues that plaintiff had ongoing back and neck pain since a 2014 injury, plaintiff testified that he was still able to complete the ride for Michigan Bikers Helping Veterans each summer since 2008. Plaintiff testified that he stopped attending physical therapy and stopped experiencing back pain from his 2014 accident before the 2015 accident. Furthermore, plaintiff was not diagnosed with two bulging disks in his neck until 2016.

In addition to his deposition testimony, plaintiff presented medical records in support of his response in opposition to defendant's motion for summary disposition. Those records supported plaintiff's contention that following the 2015 accident, he experienced shoulder, neck, and back pain. The neck pain ranged from 3/10 at best and 9/10 at worst, and would be aggravated by flexion and movement. The records document that plaintiff's neck pain caused by the bulging discs caused a limitation on functional activities such as sitting, household chores, and lifting, and that he was unable to work without pain. It also caused difficulty sleeping, turning his head, and

---

[5] Defendant does not challenge on appeal the other required elements necessary for a trial court to find that a serious impairment of body function exists.

driving. Because of his pain, plaintiff attended physical therapy, received pain management, and he underwent epidural steroid injections for approximately a year, none of which brought relief.

Catherine Onsted, plaintiff's wife, also presented testimony during her deposition in support of plaintiff. She stated that plaintiff was a really tough man who normally just "sucks it up" and only complains if his pain is unbearable. In the six months after the accident, plaintiff complained of neck or back pain all the time, but it was usually the neck. She testified that he was unable to do all of his household chores and activities at home after the accident. She described him as a handyman and stated that he could not do "a lot of things" anymore, even though he wanted to. She recalled a specific incident in the summer of 2016 in which they had to hire someone to put down a patio because he could not do it. Catherine testified that plaintiff used to take care of the lawn, and she would help. However, after the accident, Catherine had to take care of the lawn, and plaintiff would only help. Additionally, she testified that after the accident, plaintiff "didn't get down on the floor as much as he used to with [their] grandchildren just because it bothered him. You know, everything hurt. He was not as patient with all of us as he used to be." She testified that plaintiff's neck problems continued until the May 2017 accident, which caused a host of additional injuries.

Defendant discounts Catherine's testimony because it is not consistent with plaintiff's own testimony. However, the "court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition." *Innovative Adult Foster Care, Inc*, 285 Mich App at 480. Even if the weight of the evidence appears to be in favor of one party at the summary disposition stage, courts may not determine issues of weight. See *id*.

The record indicates that there was conflicting evidence about whether plaintiff's accident affected his general ability to lead his normal life. See *McCormick*, 487 Mich at 202 ("[T]he statute only requires that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected."). As this Court has held, when there is conflicting evidence, the trial court should deny a motion for summary disposition. See *Patrick v Turkelson*, 322 Mich App 595, 615; 913 NW2d 369 (2018). Therefore, the trial court properly denied defendant's motion for summary disposition. Viewing the evidence de novo in the light most favorable to plaintiff, there was a genuine issue of material fact whether plaintiff had an impairment that affected his general ability to lead his normal life. See *Quinto*, 451 Mich at 362.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Jane M. Beckering
/s/ Mark T. Boonstra